## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## <u>NORTHERN DIVISION</u>

JEFFREY F. and DONNA LAWRENCE     *

       Plaintiffs             *

   v.                              *

THE "IMAGINE...!" YACHT, LLC, et al.    *

       Defendants        *

CIVIL ACTION

NO. RDB-02-CV-3224

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*

THE "IMAGINE...!" YACHT, LLC, et al.    *

       Third-Party Plaintiffs     *

   v.                              *

SHER & BLACKWELL, LLP          *

       Third-Party Defendant    *

                               *       *       *

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

<u>UNDISPUTED FACTS</u>

<u>ROLE OF DEFENDANT LATITUDE 38° LLC</u>

Defendant, Latitude 38° LLC, d/b/a Annapolis Bay Charters, was at all times herein a chartering broker in the Annapolis area. In 2001 Latitude 38° LLC was engaged in the business of booking charterers with various boat owners and operators for parties, weddings and business receptions. Normally, representatives of various groups or organizations seeking to charter a boat

would call Latitude 38°, to discuss available boats to accommodate their sized

group as well as menus, caterers, beverages, date, and number of people.

Latitude 38° would provide an estimate of the cost.  Thereafter Latitude 38°

would send a Charter Agreement for the customers to sign and return, and

collect money from the charterer out of which the caterer and the boat owner

and operator would be paid.  (Ex. 1, Davis depo pp. 56-57)  In return for

booking the cruise Latitude 38° receives a commission of 10%.  (Davis p. 36)

Latitude 38° does not have any representatives on board in the course of

the trip (Davis Depo. p. 45) and exercises no operational control over the

vessels before, during, or after the trip.  Id.  Latitude 38° does not "dictate to

them (vessel owners) how they run their boats."  (Davis p. 34 l. 1-2)  Latitude

38° does not maintain or pay any vessel expenses.  (Davis p. 35 l. 14-21, p. 36

l. 1-4)  Latitude 38° did not set any policy for the operators of the individual

boats which were generally Coast Guard certified yachts. (Davis p. 41 l. 18-21,

p. 42-1-3)  Krystal Davis explained division of responsibilities as follows:

> We booked the boats for the client.  And then the owners are
> the operators of the vessels, so they operate the vessel.  We put the
> client--I come on, make sure the client gets on board the boat.
> They go off for their charter and operations is left up to the owner
> and the captains and crew of the vessels.

Id. (Davis p. 44 l. 19-21, p. 45 l. 1-4)


### ROLE OF DEFENDANT, YACHT IMAGINE

Imagine Yacht is owned by Yacht Imagine LLC.  (Ex. 2, Lee Affid. Para. 2)

The shareholders of Yacht Imagine LLC are T.C. Schweer and Michael Bagley.

Id.    The Yacht IMAGINE is a 73' schooner which is Coast Guard certified for

carrying passengers.  Id.  Mike Bagley is a Coast Guard licensed Captain who operates the schooner with a crew of 2.  Id.  Yacht Imagine LLC pays it's captain and crew directly. Id.  In September of 2001 the owners of IMAGINE yacht were managing their own yacht (Davis p. 16 l. 11-15,  p. 50 l. 5-11) and Latitude 38° was acting only as a chartering broker.  (Davis p. 16 l. 16-21, p. 17 l. 1-9)

THE CONTRACT

In the present case the law firm of Sher & Blackwell contacted Latitude 38° d/b/a Annapolis Bay Charters to charter a boat for an outing for its law firm staff.  Latitude 38° put together a "Charter Agreement for all of the clients who are chartering vessels and it details the financial aspect of the charter as well as any terms or conditions for the charter." (Davis p. 19 l. 21- p. 20 l. 1-3) The contract sets forth the details of the itinerary for a 3-hour sail as well as catering and bar service.  Id. p. 25 l. 1-10.

Ms. Davis dealt with Lisa Henshaw, office administrator of the law firm of Sher & Blackwell.  Id. p. 25 l. 11-18.  It is undisputed that the charterer in this case is the law firm of Sher & Blackwell.  Id. p. 29 l. 6-10.  Latitude 38° LLC is only the agent.  Id.  Lisa Henshaw testified that she had read the contract and signed it with the authorization of the managing partner, Mark Fink (Ex. 3, Henshaw depo. p. 8 l. 1-2), and that she understood that Sher & Blackwell was chartering the vessel.  (Henshaw p. 32 l. 7-12)  After several fax exchanges, Lisa Henshaw signed for Sher & Blackwell as "Charter Client" and Krystal Davis signed as "booking agent" for the vessel Yacht IMAGINE.  (See Contract,

Exhibit 4)  She said it would not have affected her decision to charter the vessel had she known a cannon would be fired.  (Henshaw depo. p. 34 l. 4-9)

<u>KNOWLEDGE OF LATITUDE 38°</u>

Latitude 38° had suggested that parties charter Yacht IMAGINE on numerous occasions before the occurrence and had received no performance complaints.   (Davis p. 58) Neither Latitude 38°'s principal, Jim Lee,  (Affid. para. 1)  nor Krystal Davis, had heard any complaints about the presence or use of a cannon on board the Yacht IMAGINE prior to the occurrence.  (Davis p. 43)  Jim Lee had been on board Yacht IMAGINE as a crewmember and had observed only competent and safe operation.  (Lee Affid. para. 3)  Latitude 38° verified that Yacht IMAGINE was fully Coast Guard licensed up-to-date and insured.  (<u>See</u> <u>Davis</u> p. 13 l. 1-19, p. 60 l. 8-9)  The Yacht IMAGINE "has a great reputation in town as far as a good experience on the water.  The captain and crew never had a complaint..." (Davis p. 58 l. 5-9)  The Latitude 38° LLC had never had any reported incident of personal injury.  (Davis p. 30-31)  Latitude 38° is in close contact with the boats and captains of the boats and generally speak after charters to find out how everything went.  <u>Id</u>. 32-33.

THE EVENTS OF SEPTEMBER 16, 2001 REGARDING
<u>ALLEGED NEGLIGENT DISCHARGE OF CANNON</u>

The undisputed testimony regarding the events immediately preceding the firing of the cannon will come from 8 of the Sher & Blackwell passengers on board on September 16, 2001 as follows:

Jeffrey Pike, a Government Relations employee of the firm of Sher & Blackwell and husband of the office manager, Lisa Henshaw, believes that he was told by a young lady, a member of the crew, that the cannon was to be fired. (Ex. 5, Pike depo. p. 11 l. 17-21, p. 12 l. 1-3) This announcement was made approximately 5 minutes before the cannon was fired. (Pike p. 28 l. 5-10) He believes the female crewmember said "you may want to move away." (Pike p. 28 l. 11-18) But he does not recall her saying you may want to cover your ears. (Pike p. 28 l. 19-21)

John Butler, another attorney with the firm, believes the cannon was fired as a salute to another passing schooner and that he had heard of such cannon salutes 3 times before. (Ex. 6, Butler depo. p. 6 l. 13-21; p. 7 l. 1-17) He does not recall the announcement (Butler p. 12 l. 17-21, p. 13, l. 1-3) but was aware of the cannon and he and his son did put some distance between themselves and the cannon. (Butler p. 14 l. 19-21)

Another attorney, passenger, Donald Kassilke, also saw the cannon placed on the deck (Ex. 7, Kassilke depo. p. 8 l. 12-15) and recalls being told about the custom of saluting a passing vessel. (Kassilke p. 18 l. 21, p. 19 l. 1-3) He does recall an announcement being made and believes when the cannon was fired he had his hands over his ears. (Kassilke p. 19 l. 17-19)

Passenger, Earl Comstock, another Sher & Blackwell attorney, recalls some discussion by the Captain about the tradition of firing a shot and the Captain asking people to step back when the cannon was fired. (Ex. 8,

Comstock depo. p. 15 l. 20-21, p. 16 l. 1-7)  He did not cover his ears and does not recall the crew telling people to cover their ears.

Heather Spring, an associate with the firm, heard the crew say they were going to fire a cannon salute, that it would be loud, and that if you are nearby you should move.  (Ex. 9 Spring depo. p. 13 l. 5-14)  She testified this was said "to whoever was listening."  (Spring p. 13 l. 20)  She didn't hear any complaints about loudness.  (Spring p. 17 l. 10-12, p. 18 l. 1-5)  She testified she was not surprised when they brought a cannon out and, knowing that a cannon was on board would not have affected her judgment one way or the other on the decision whether to go on the trip.  (Spring p. 21 l. 16-21, p. 22 l. 1-3)  Knowing the other partners as she does, she also did not believe it would have affected anyone's decision to go on the trip.  (Spring p. 22 l. 4-10)

Mark Atwood, another attorney on board, also saw the cannon before it was fired.  (Ex. 10, Atwood depo. p. 8 l. 13-15)  He was aware that it was a customary practice or nautical custom and that it would be loud.  (Atwood p. 9 l. 2-21, p. 10 l. 4-5)  He does not remember what other precautions they discussed.  (Atwood p. 10 l. 5-8)  He did not hear any complaints about its loudness.  (Atwood p. 17 l. 11-14)

Mark Fink, managing partner of Sher & Blackwell, and a close personal friend of the plaintiff, does recall a young woman saying that they were going to fire a cannon off, that it would be a loud noise.  (Ex. 11, Fink depo.p. 11 l. 18-21, p. 12 l. 1-8)  This was a general announcement.  (Fink p. 12 l. 9-12,)  He does not recall her asking anyone to move away or to cover their ears (Fink p.

16 l. 14-20), but he did cover his ears, although he was 20-25' away because someone said it would be a loud noise. (Fink p. 17 l. 5-8, 16-18) No one complained to him about the cannon. (Fink p. 21 l. 2-7)

Lisa Henshaw, the office administrator, coordinated the trip and was also present on board. (Henshaw p. 9) She did see the cannon brought out and placed on deck at midship and does recall the announcement that they would fire it when two ships are passing, that it would be loud, and that the passengers should cover their ears and move back. (Henshaw p. 14 l. 12-16) She herself moved back. (Henshaw p. 15 l. 2-4, p. 16 l. 10-13) She said no one in the group objected or said it was not a good idea. (Henshaw p. 15 l. 12-14) She felt she could have objected but saw no need to. (Henshaw p. 16 l. 3-9) She assumed that the plaintiff heard the instructions but does not know for sure. (Henshaw p. 17 p. 18-21) Afterwards the plaintiff did complain to her regarding the loudness, asking her "did you know that they were going to do that?" (Henshaw p. 21 l. 20-21, p. 22 l. 1-3) She told plaintiff that they made an announcement to cover your ears. (p. 22 l. 5-8) She said plaintiff didn't hear the announcement, but she recalls that everyone close to her heard the announcement and either backed off or held their ears. (Henshaw p. 21 l. 13-17)

She was not surprised when they brought out a cannon. (Henshaw p. 33 l. 9-11) She did not think it was a danger. (Henshaw p. 33 l. 12-15) She testified it was not "like they made an announcement and bang." (Henshaw p.

35 l. 2-3)  There were a couple of minutes between the time they made the announcement and the cannon going off.  (Henshaw p. 33 l. 2-3)

LAW AND ALLEGATIONS

The plaintiffs' Amended Complaint is governed by maritime law.  The test for admiralty tort jurisdiction requires that an incident occur on navigable waters, bear a substantial relationship to traditional maritime activity, and have a potentially disruptive impact on maritime commerce.  Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292, 1990 AMC 1801 (1990).  As to contracts the disputes arising out of charterparties and other arrangements for hire of a vessel are considered maritime contracts and subject to the application of admiralty law.  Kirno Hill Corp. v. Holt, 618 F.2d 982, 1980 AMC 1776 (2nd Cir. 1980.)

ALLEGATIONS OF AMENDED COMPLAINT

COUNT I - NEGLIGENCE

In Count I (Negligence) the plaintiffs allege that Latitude 38° LLC "owed a duty to plaintiff, Jeffrey F. Lawrence, to ensure, among other things, that the vessel IMAGINE was properly and sufficiently manned by individuals who were competent and adequately trained, experienced, supervised and equipped for the task at hand."  (Amended Complaint para. 14)  In addition, plaintiffs allege that Latitude 38° LLC "owed a duty to plaintiff…to ensure, among other things, that the vessel IMAGINE and its crew would not fire or discharge an explosive device in close proximity to its passengers."  (Amended Complaint para. 15)

In plaintiffs' Answers to Interrogatories propounded by Latitude 38° LLC requesting the factual basis for these allegations, plaintiffs essentially repeated the allegations stating that Latitude 38° LLC had a duty "to ensure" that its crew "would not fire or discharge an explosive device in close proximity to the passengers," "as well as bringing in or allowing dangerous and/or illegal devices to be discharged, fired, or deployed on board the vessel," and failing "to promptly warn passengers, like the plaintiff, of the dangerous and hazardous conditions then and there existing."

For purposes of discussion, these contentions against Latitude 38° LLC at charter broker can be distilled to three:

      1.    Negligent hiring, retention, and supervision of the crew;

      2.    Duty to "ensure" that the crew does not commit a negligent act in the course of its duties with respect to firing the cannon (i.e. discharge the cannon in close proximity to and without warning to the passengers); and

      3.    Duty to "ensure" that the cannon alleged to be a "dangerous and illegal device" was not on board the yacht that plaintiff's law firm chartered.

ARGUMENT

For the reasons stated hereinafter a chartering broker or "booking agent" is neither an insurer of the safety of groups who are booked onto a particular vessel nor warrants that the voyage will be free of risk or possible negligence of a third party.  It is not required to warn of dangers unknown to the charter broker, and in the absence of evidence to the contrary, is entitled to rely upon

the competence of the captain and crew to whom the safety of the passengers is consigned.  It is undisputed that Latitude 38º LLC did not know that a cannon would be fired on board this vessel but even if it did, based on this record it could not be foreseen that the competent and licensed captain and crew would not take sufficient precautions prior to firing the cannon.

In fact, in this case the Captain and crew did take proper precautions.  It is evident that every passenger on board was aware that a cannon was to be fired, except for the plaintiff.  Most of the passengers on board heard the announcement that the cannon would be fired, why it was being fired, that the cannon would be loud, that they should cover their ears, or step back.  Those who do not recall the announcement to cover their ears at least saw the cannon, assumed it would be loud, and stepped back, and some covered their ears.  Looking at the facts in the best light to the plaintiff (even if it is believed that the plaintiff was the only one on board who did not hear the announcement because he was down below getting food or going to the head), it is not something that the charter broker should have anticipated, even if it knew that a cannon would be on board the boat.

It is difficult to find cases where personal injury plaintiffs have attempted to hold the charterer broker liable for shipboard injuries.  However, cases involving tour operators, booking or ticket agents, marketing representatives, and even charterers seem to provide a framework for decision.

In Klinghoffer v. ACHILLE LAURO, 816 F. Supp. 934  (S.D.N.Y. 1993) 1993 AMC 2246, the plaintiffs sought to hold the travel agent who sold the

ticket for the tour and the marketing agent for the operator of the ACHILLE LAURO, liable for the death of a passenger, Mr. Klinghoffer, due to the 1985 highjacking of the ACHILLE LAURO, for their failure to warn that the safety procedures on board were not sufficient.  Neither agent owned, operated nor controlled the vessel or managed or supervised the security.  In granting these agents' summary judgment the court concluded, by analogy to a charterer, that those who do not assume control or operation of the vessel have no responsibility for negligence of the crew unless the charter provides otherwise. In the Klinghoffer case, the plaintiffs provided no facts rebutting the affidavits submitted by the travel agency and marketing representative that the shipowner was well respected within the travel industry and that they had received no complaints about security procedures aboard its ships. Accordingly, the plaintiffs failed to raise a material issue of fact supporting their allegation that the defendants knew or should have known that security measures aboard the ACHILLE LAURO were inadequate.  Id. at 937, 2249.

In Stafford v. Intrav, Inc., 841 F. Supp. 284 (E.D.Mo. 1993) 1994 AMC 934, a passenger  suffered personal injury when she fell from a platform on a cruise ship and sued Intrav, the tour operator,who sold the package tour.  In fact, in that case Intrav was not only the tour operator but also chartered the vessel under written charter agreement that it would provide a travel director, tour leader and tour guide who would actually go on the vessel. Notwithstanding this, the court held that, even though Intrav was the charterer, "a charterer has no responsibility for the negligent operation or

maintenance of the vessel or for the negligence of her crew unless it is a demise charter." Id. at 286, 935. The court held that there was no special relationship between the tour operator and the passenger as would give rise to some special duty particularly where the tour operator did not control the premises, did not own or maintain the vessel or was not responsible for placement of the gangplank. The court further noted that as travel agent it had no duty to disclose information that was obvious and apparent to the traveler. (In that case an open space on the edge of the gangplank.)

The plaintiffs in Stafford also claimed that the agent had a duty to use reasonable care in selecting the vessel upon which it conducted the tour. The information known to the tour operator was that it was an excellent vessel, experienced a favorable reputation with in the travel industry, and there was nothing to suggest that prior similar accidents involving the gangway had occurred.

The North Carolina U.S. District Court case of Honeycutt v. Tour Carriage, Inc., et al., 997 F. Supp. 694 (W.D.N.C. 1996), provides an excellent discussion of the case law regarding liability of a tour operator for injuries to its customers. In that case, the plaintiff broke her ankle during a 5-day vacation trip to Copper Canyon in Mexico while horseback riding, on the ground that the tour operator told her that the horseback ride was not dangerous. The U.S. District Court concluded, after reviewing a number of cases, that:

> Federal and state courts throughout the country, including the Courts of Appeals for the Third, Sixth, Seventh, and Eighth Circuits have held uniformly that tour operators simply are not liable for the negligent acts of third-party suppliers of services to

tourists.  This uniformity of opinion exists even when, unlike here,
the tour operator has not, in a writing, disclaimed liability for
actions of independent suppliers of services to the tour.

At 17.

The court made reference to several cases including the following:

Manahan v. MWA, Inc., 821 F. Supp. 1105 (D.V. 1992), reconsideration denied,

821 F. Supp. 1110 (D.V. 1992) affm'd (3d Cir. 1993) (court granted tour

operator's Motion for Summary Judgment holding that it was not liable for the

arguably negligent advice of tour ground handler regarding the safety of

walking to a restaurant).  Levine v. General Mills, Inc., 519 F. Supp. 332

(N.D.Ga. 1981), (tour operator not liable for injuries plaintiff suffered when she

fell on a rocky beach during an optional shore excursion from a ship).  See

Dorkin v. American Express Co., 74 Misc. 2d 673, 345 NYS 2d 891, 893-94,

1973 aff'd 43 A.D. 2d 877, 351, NYS 2d, 190, 192 (1974), (tour operator "did

not guarantee a good time…nor that plaintiffs would return safely without

adverse adventure or harm.")  Hacett v. Cape Cod Bicycle Tours, Inc., Civil

Action No. 87-0016Z, 1987 U.S. Dist Lexis 8321 (D. Mass. 1987) (tour

operator's only duty was to make the necessary reservation.  Defendant did not

agree to insure plaintiff's safety and therefore breached no duty in failing to do

so.)  (Appendix 1)   With respect to allegations regarding selection of the third-

party the Honeycutt court quoted:

> The duty of tour operators and travel agents to investigate the
> quality of suppliers of services is well defined.  The tour operator may
> rely initially on the general reputation of the supplier and may continue
> to offer services of the supplier where its experience with the supplier has
> been satisfactory.

At 702, see e.g., Wilson v. American Transair, Inc., 874 F.2d 386 (7th Cir.

1989), Fling v. Hollywood Travel & Tours, 765 F. Supp 1302 (N.D. Ohio 1990)

affm'd 933 F.2d 1008 (6th Cir. 1991).

A.    Latitude 38° did not employ the captain and crew or train,
      or otherwise supervise the performance of the crew and there
      is no evidence that the captain or crew were incompetent,
      inadequately trained, inexperienced, unsupervised or
      ill-equipped for their duties.

The record is clear that Latitude 38° is not the owner or operator of

Yacht IMAGINE.  It is undisputed in the record that Latitude 38° LLC did not

hire, train, pay, supervise, discipline or otherwise exercise any supervisory

responsibility for the Captain and crew of the Yacht IMAGINE.  Accordingly,

what amounts to a negligent retention or hiring allegation cannot be

maintained as a matter of law as defendant neither hired nor retained the crew.

Even more importantly, there is absolutely no basis in the record supporting a

conclusion that the alleged occurrence, if negligence, was anything other than

an isolated negligent act of firing the cannon too close to the passengers

without sufficient warning.  Such an isolated act of negligence would not

support a claim that the Captain and crew are incompetent, inadequately

trained, inexperienced, unsupervised or ill-equipped for the task at hand as

alleged by the plaintiffs.

B.    Latitude 38° LLC is not the insurer against possible negligent
      acts of third-parties.

First, it is clear that as Latitude 38° LLC is not the employer of the

Captain and the crew and as a matter of law, has no vicarious liability for

negligent acts of the crew.  In addition, whether Latitude 38° LLC is viewed

simply as a charter broker, booking agent, or even as the charterer, based on the cases cited above it has no responsibility for the operational negligence of the Captain and crew who are hired and retained by the employer, Yacht IMAGINE.

The authorities set forth above are clear that defendant, Latitude 38° LLC, is not the insurer of a risk free trip. It would be anomalous for the charter broker to owe any duty higher than the duty of the vessel owner, Yacht IMAGAINE itself who hires the captain and crew to operate the vessel. Even the vessel owner and his captain and crew do not owe a warranty of seaworthiness or assume absolute liability for accidents to passengers. The Supreme Court in Kermerac v. Compagnia Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 1959 AMC 597 (1959), held that a vessel owner owes only a duty of due care to its passengers. The text writers, Gilmore and Black, The Law of Admiralty, 2nd Ed., state:

> The subject of liability to passengers for injury may be summarily handled here, as the principles involved differ little from those in use ashore. The liability basis is negligence. There is no "insurer" relation and no "warranty."

p. 23.

The Second Circuit, in rejecting an argument that shipboard passenger injuries require application of some "heightened" standard of care, explained:

> Although some older cases called for a higher degree of care aboard ship, it is now clear in this circuit that the appropriate standard is one of reasonable care under the circumstances. Rainey v. Parkay Paquet Cruises, Inc., 1983 AMC 2100, 2103, 709 F.2d 169, 172 (2nd Cir. 1983). See also Desiderio v. Celebrity Cruise, 1999 AMC 2723 at 2742.

C.      Latitude 38° LLC as chartering broker had no duty to
        discover a cannon on board and the undisputed evidence
        indicates that Latitude 38° LLC was not aware that a
        <u>cannon was on board.</u>

The undisputed evidence is that Latitude 38° LLC had no

knowledge prior to this occurrence that a cannon was on board the Yacht

IMAGINE at the time the charter was booked by Sher & Blackwell.  Moreover,

there is no evidence that the cannon itself is dangerous or an illegal device if

properly discharged.  Plaintiffs' main complaint is that the crew discharged it in

close proximity to the passengers and did not warn each and every passenger,

a factual matter which is disputed, but not relevant for purposes of our motion.

COUNT II – BREACH OF CONTRACT

In Count II of the plaintiff's Amended Complaint plaintiffs appear to

erroneously assert liability of Latitude 38° LLC based on Latitude 38°'s alleged

status as charterer under the Charter Agreement.  Therein, plaintiffs allege:

> 21.  Pursuant to Paragraph 5 of the Charter Agreement and
> Condition, Annapolis Bay Charters and Latitude 38° LLC,
> understood and agreed that at all times they agreed to keep the
> passenger areas clean and safe for the benefit of their guests.

Paragraph 5 in the Charter Agreement states:

> 5.  <u>Guest Areas:</u>  Charterer understands and agrees that at all
> times the possession and use of the passenger areas under care
> and custody of the charterer, who agrees to keep these areas clean
> and safe for the benefit of their guests.  In the event any guests are
> injured in the passenger areas during the charter, unless caused
> by the negligence of the owner, the charterer agrees to hold owner
> harmless from liability.  In the event the conduct of the charterer,
> or the guests, interferes with the safe navigation of the vessel, or
> endangers the vessel, crew, or passengers, the captain shall have
> the unquestioned right to terminate the voyage.  Under such
> circumstances there will be no refund of any portion of the charter

> fee.  Navigation of the vessel and control of the non-passenger
> areas shall be under the exclusive control of the captain.

This paragraph clearly relates only to Sher & Blackwell's responsibility as

charterer to maintain control over its party, the passengers, in the course of

the trip.  It is undisputed that the law firm of Sher & Blackwell was the

charterer.  Accordingly, the law firm of Sher & Blackwell was named by both

defendants as a third-party defendant based in part on the plaintiffs'

allegations in Count II.

Discovery has revealed that had Sher & Blackwell exercised it's

responsibility during the course of the trip to make reasonable efforts to

instruct its own guests to pay attention and listen to the crew's instructions

that the cannon was about to be fired, perhaps the plaintiff would have been

aware of what was going on around him.  If that contractual obligation belongs

to anyone, it belongs to the charterer, Sher & Blackwell, not Latitude 38° who

had no supervisory individuals on board.  In any event, because it is

undisputed that Latitude 38° was not the charterer as a matter of law, this

breach of contract count should be dismissed as to it.

COUNT III – VIOLATION OF MARYLAND STATUTE

Count III alleges that "firing or discharging of an explosive device

exceeding a noise level of 90dB(a) on the waters of the State of Maryland"

allegedly causing physical injury is a violation of Maryland Code Annotated

Natural Resources Article § 8-725.4(b).  (Appendix 2)  Plaintiffs also allege that

such a violation serves as a basis for recovery of $2,000,000 in civil damages

plus interests, costs and attorneys' fees.

The section in question states as follows:

> (b)  Permitted Noise Levels.  (1) Except as provided in subsection (d) of this section, a person may not operate a vessel on the waters of the state so as to exceed a noise level of 90dB(a).

It is apparent from a reading of the whole statutory section that it relates to engine noise, primarily big speedboats.  It speaks in terms of requirements of muffling devices or systems "which muffles or suppresses engine noise."  Id. Sec. (c).  The regulations reference devices "capable of reducing the noise from the engine to levels that shall meet the noise levels established by the Department."  See Comar 08.18.03.02 B3.

Even assuming the statute could be stretched to cover episodic noises such as the firing of a cannon, fireworks, or a loud horn sounded on a vessel, such a statute does not imply the presence of a private cause of action for civil damages.  See Staley v. Americorp Credit Corp., et al. 164 F. Supp 2d 578 (D. Md. 2001); Erie Insurance Company v. Chops, 322 Md. 79, 585 A.2d 232 (1991).  In Fisher v. O'Connor's, 53 Md. App. 338, 452 A.2d 1313 (1982).

## CONCLUSION

For the above stated reasons all counts of the Amended Complaint against Latitude 38° should be dismissed.


<u>        /s/        </u>
David W. Skeen

19

/s/
_____

Wright, Constable & Skeen, L.L.P.
One Charles Center, 16th Floor
100 N. Charles Street
Baltimore, Maryland  21201-3812
(410) 659-1305
Attorneys for Defendant and
Third-Party Plaintiff,
Latitude 38°, LLC

DWS.LATITUDE.LAWRENCE.MEM.SUPP.MSJ.lan